UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES IRVING DALE,<br>MICHAEL EUGENE KOCH,<br>JAMES EDWARD HAYES,<br>JOSIA JEREMIAH FUERST,<br>ROBERT EUGENE BLACKWELL,<br>JEFFERY JACOB-DANIEL<br>KLINGHAGEN,<br>UNKNOWN MIKE DURFEE STATE<br>PRISON INMATES,<br><br>Plaintiffs,<br><br>vs.<br><br>DENNIS KAEMINGK, SOUTH DAKOTA<br>SECRETARY OF CORRECTIONS; IN<br>HIS INDIVIDUAL AND OFFICIAL<br>CAPACITY; ROBERT DOOLEY,<br>WARDEN AT MDSP AND THE<br>DIRECTOR OF PRISON OPERATIONS<br>FOR THE SOUTH DAKOTA DOC; IN<br>HIS INDIVIDUAL AND OFFICIAL<br>CAPACITY; JOSHUA KLIMEK, UNIT<br>MANAGER AT MDSP; IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY;<br>TAMMY DEJONG, UNIT<br>COORDINATOR AT MDSP; IN HER<br>INDIVIDUAL AND OFFICIAL CAPACITY;<br>SUSAN JACOBS, ASSOCIATE WARDEN<br>AT MDSP; IN HER INDIVIDUAL AND<br>OFFICIAL CAPACITY; REBECCA<br>SCHIEFFER, ASSOCIATE WARDEN<br>AND THE ADMINISTRATIVE REMEDY<br>COORDINATOR AT MDSP; IN HER<br>INDIVIDUAL AND OFFICIAL CAPACITY;<br>JENNIFER STANWICK, DEPUTY<br>WARDEN AT MDSP; IN HER<br>INDIVIDUAL AND OFFICIAL CAPACITY; | 4:15-CV-04103-RAL<br><br>REPORT AND RECOMMENDATION<br>ON SCREENING |

MICHAEL DOYLE, CORRECTIONAL
OFFICER, WITH THE RANK MAJOR, AT
MDSP; IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY; JEREMY
LARSON, CORRECTIONAL OFFICER,
WITH THE RANK SERGEANT, AND THE
DISCIPLINARY HEARING OFFICER AT
MDSP; IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY; COREY TYLER,
CORRECTIONAL OFFICER, WITH THE
RANK SERGEANT, AT MDSP; IN HIS
INDIVIDUAL AND OFFICIAL CAPACITY;
MICHAEL MEYER, CORRECTIONAL
OFFICER AT MDSP; IN HIS
INDIVIDUAL AND OFFICIAL CAPACITY;
KELLY TJEERDSMA, CORRECTIONAL
OFFICER, WITH THE RANK
CORPORAL, AT MDSP; IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITY;
LORI DROTZMAN, GENERAL
EDUCATION DIPLOMA TEACHER,
WHO ALSO IS IN CHARGE OF THE
LAW LIBRARY AT MDSP; IN HER
INDIVIDUAL AND OFFICIAL CAPACITY;
MICHAEL JOE HANVEY, PHYSICIANS
ASSISTANT AND HEALTH CARE
PROVIDER AT MDSP; IN HIS
INDIVIDUAL AND OFFICIAL CAPACITY;
ANDRA GATES, NURSING
SUPERVISOR AND HEALTH CARE
PROVIDER AT MDSP; IN HER
INDIVIDUAL AND OFFICIAL CAPACITY;
KELLY SWANSON, HEALTH SERVICES
SUPERVISOR AT MDSP; IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITY;
STEPHANIE HAMILTON, NURSE AT
MDSP; IN HER INDIVIDUAL AND
OFFICIAL CAPACITY; MARY
CARPENTER, EMPLOYEE OF THE
SOUTH DAKOTA DEPARTMENT OF
HEALTH AND ASSISTS WITH INMATE
HEALTH CARE DECISIONS FOR
INMATES INCARCERATED AT MDSP;
IN HER INDIVIDUAL AND OFFICIAL
CAPACITY; BARRY SCHROETER,

SUPERVISOR FOR CBM
CORRECTIONAL FOOD SERVICES AT
MDSP; IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY; JENNIFER
BENBOON, DIETITIAN EMPLOYED BY
CBM CORRECTIONAL FOOD
SERVICES; IN HER INDIVIDUAL AND
OFFICIAL CAPACITY;  CBM
CORRECTIONAL FOOD SERVICES,
PRIVATE FOR PROFIT COMPANY
CONTRACTED BY THE SOUTH
DAKOTA DOC TO PROVIDE MEALS TO
INMATES INCARCERATED AT MDSP;
DELMAR SONNY WALTERS,
ATTORNEY AT LAW CONTRACTED BY
THE SOUTH DAKOTA DOC TO
PROVIDE LEGAL SERVICES TO
INMATES INCARCERATED AT MDSP;
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY;  UNKNOWN DEPARTMENT
OF CORRECTIONS EMPLOYEES,
CORRECTIONAL OFFICERS
EMPLOYED BY THE SOUTH DAKOTA
DOC WHO WORK AT MDSP;
UNKNOWN DEPARTMENT OF
CORRECTIONS HEALTH SERVICES
STAFF, HEALTH SERVICES
DEPARTMENT STAFF EMPLOYED BY
THE SOUTH DAKOTA DOC TO
PROVIDE HEALTH CARE FOR
INMATES INCARCERATED AT MDSP;
AND  UNKNOWN CBM CORRECTIONAL
FOOD SERVICES EMPLOYEES,
EMPLOYEES OF CBM CORRECTIONAL
FOOD SERVICES AT MDSP;

Defendants.

# INTRODUCTION

Plaintiffs are inmates at the Mike Durfee State Prison ("MDSP") in

Springfield, South Dakota. They have filed a *pro se* civil rights lawsuit

pursuant to 42 U.S.C. § 1983 and have, as required, paid their initial partial filing fee.[1]  This matter has been referred to this magistrate judge for handling pretrial matters pursuant to 28 U.S.C. § 636(b)(1) and the standing order of the Honorable Karen E. Schreier dated October 16, 2014.  The purpose of this opinion is to screen the plaintiffs' complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) to determine if it states a claim upon which relief may be granted.

## DISCUSSION

**A.   Screening Pursuant to 28 U.S.C.  §§ 1915(e)(2)(B)(ii) and 1915A(b)(1)**

28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) require the court to "screen" prisoner complaints.  Those statutes state as follows:

> **1915(e)(2)**  Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that—

------------------------------------------------------------

[1] There were fourteen plaintiffs when this lawsuit was initially filed.  See Docket 1.  The court issued an order informing all plaintiffs they would each be required to separately pay the $350 filing fee.  See Docket 21.  The court gave the plaintiffs a deadline to advise the court whether they wished to proceed, and the opportunity to withdraw before assessing the filing fee.  Id.  The plaintiffs appealed this court's order, but the district court affirmed and required each plaintiff to pay his own $350 filing fee.  See Dockets 22 and 62.  In the meantime, the plaintiffs also moved for but were denied class action status.  See Dockets 23, 48, 52 and 63.  Judge Lange ruled that plaintiffs' motion for class action certification may be reconsidered after their complaint is screened.  Docket 62.  Judge Lange explained that if their complaint survives screening, then the plaintiffs may re-file a motion for class certification if appropriate.  Id.

After the appeals regarding individual payment of the filing fee were concluded and the time for response had passed, only the six above-named plaintiffs of the original fourteen remained.  Mr. Dale asked for and received an extension of time to pay his initial fee.  Docket 93.  The remaining plaintiffs' claims are now screened pursuant to 28 U.S.C. § 1915.

\*\*
**(B)** the action or appeal
    **(i)** is frivolous or malicious
    **(ii)** fails to state a claim upon which relief may be granted; or
    **(iii)** seeks monetary relief against a defendant who is
    immune from such relief.

**§ 1915A.  Screening**
**(a) Screening.—**The court shall review, before docketing, if
feasible, or in any event, as soon as practicable after docketing,
a complaint in a civil action in which a prisoner seeks redress
from a governmental entity or officer or employee of a
governmental entity.
**(b) Grounds for dismissal.—**On review, the court shall identify
cognizable claims or dismiss the complaint, or any portion of
the complaint, if the complaint—
**(1)** is frivolous, malicious, or fails to state a claim upon which
relief may be granted; or
**(2)** seeks monetary relief from a defendant who is immune from
such relief.
**(c) Definition.—**As used in this section, the term "prisoner" means
any person incarcerated or detained in any facility who is
accused of, convicted of, sentenced for, or adjudicated
delinquent for, violations of criminal law or the terms and
conditions of parole, probation, pretrial release, or diversionary
program.

Pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), a prisoner's

complaint should be dismissed on screening if it "fails to state a claim upon

which relief may be granted."  This standard is the same standard as is used to

determine whether a complaint satisfies the standards of FED. R. CIV. P.

12(b)(6).  Kane v. Lancaster County Dept. of Corrections, 960 F. Supp. 219

(D. Neb. 1997); Alba v. Montford, 517 F.3d 1249, 1252 (11th Cir. 2008).  A

prisoner complaint is screened for dismissal under 28 U.S.C. § 1915

"accepting as true all of the factual allegations contained in the complaint and

affording the plaintiff all reasonable inferences that can be drawn from those

allegations."  Jackson v. Nixon, 747 F.3d 537, 540-41 (8th Cir. 2014).  Further,

"a *pro se* complaint, however inartfully pleaded, [is held] to less stringent standards than formal pleadings drafted by lawyers." Jackson, 747 F.3d at 541. (citation omitted).

FED. R. CIV. P. 12(b)(6) allows dismissal if the plaintiff has failed to state a claim upon which relief can be granted. Plaintiffs must plead "enough facts to state a claim to relief that is *plausible* on its face." Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)(emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)). A complaint does not need "detailed factual allegations" to survive, but a plaintiff must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action. Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). There is also a "plausibility standard" which "requires a complaint with enough factual matter (taken as true)" to support the conclusion that the plaintiff has a valid claim. Id. at 556. The plaintiffs' complaint must contain sufficiently specific factual allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief. Id.

There are two "working principles" that apply to Rule 12(b)(6) motions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a complaint. Id. (citing Papasan, 478 U.S. at 286). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do

6

not suffice." Id. (quoting Twombly, 550 U.S. at 555).  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)).  Where the plaintiff's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has *alleged*–but has not "show[n]"–that he is entitled to relief as required by Rule 8(a)(2).  Iqbal, 556 U.S. at 679 (emphasis added).

A reviewing court should begin by identifying statements in the complaint that are conclusory and therefore not entitled to the presumption of truth.  Id. at 679-680.  Legal conclusions must be supported by factual allegations demonstrating the grounds for a plaintiff's entitlement to relief.  Id. at 679; Twombly, 550 U.S. at 555; Fed. R. Civ. P. 8(a)(2).  A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.  These are the principles guiding the court's evaluation of the plaintiffs' complaint.

## B. Preliminary Matters-Paragraphs in the Complaint Pertaining to Plaintiffs Who Chose to Drop out of the Lawsuit

Before the court proceeds to the claims made by the remaining plaintiffs, it is important to clarify which portions of the complaint will be considered and which portions of the complaint will not be considered on screening.  It is well

established that "a prisoner cannot bring claims on behalf of other prisoners."
Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985).  Instead, a prisoner
must allege a personal loss.  Id. Those paragraphs of the complaint, therefore,
which were specific to claims of injury to the plaintiffs who have chosen to
disassociate themselves from this lawsuit should be stricken from the
complaint and will not be considered.  This is because the remaining plaintiffs
cannot pursue the claims of the dismissed plaintiffs on their behalf. Martin,
780 F.2d at 1337.

The following originally named plaintiffs have been dismissed from the
complaint, either by their express request or for failing to pay the initial partial
filing fee:  Brian Holzer, Demetrius Colaites, Trevor Erickson, Guy Blesi, Kevin
Crank, Edward Darity, Robert Blackwell, and Dennis Stanish II.  Accordingly, it
is recommended that the following corresponding paragraphs and supporting
documentation be stricken and not be considered for purposes of screening the
complaint:

| | |
|---|---|
| **Brian Holzer:** | Docket 1, ¶2; Docket 7 (Affidavit of Brian Holzer) |
| **Demetrius Colaites:** | Docket 1, ¶¶ 4, 141, 142 and 143; Docket 8 (Affidavit of Demetrius Petro Colaites) |
| **Trevor Erickson:** | Docket 1, ¶¶ 5, 95, and 239; Docket 10 (Affidavit of Trevor John Erickson) |
| **Kevin Crank:** | Docket 1, ¶¶ 7, 224, 225, 226, 227 and 228; Docket 12 (Declaration of Kevin Christopher Crank) |
| **Guy Blesi:** | Docket 1, ¶¶ 6, 96, 99, 100, 101, 102, 111, and 112; Docket 11 (Affidavit of Guy Allen Blesi) |

8

| | |
|---|---|
| **Edward Darity:** | Docket 1, ¶¶ 9, 192, 193, 194, 195, 196, 197 and 198; Docket 14 (Affidavit of Edward Eugene Darity) |
| **Robert Blackwell:** | Docket 1, ¶¶ 11, 255, 257, 258, and 259; Docket 16 (Affidavit of Robert Eugene Blackwell) |
| **Dennis Stanish:** | Docket 1, ¶¶ 13, 191, 260, 261, 262, and 263; and Docket 18 (Affidavit of Dennis Louis Stanish, II) |

## C.   Portions of the Complaint Survive Screening

Liberally construed, the complaint alleges the defendants have violated the plaintiffs' constitutional or federal statutory rights in several ways:

First, the plaintiffs allege defendants have violated their First Amendment right to access to the courts by: (a) providing inadequate mail service; (b) providing inadequate legal assistance and/or law library facilities; and  (c) providing inadequately trained prison staff.

Second, the plaintiffs allege defendants have failed to provide them with an adequate administrative remedy procedure within the prison.

Third, plaintiffs allege the prison conditions at MDSP violate their Eighth Amendment right to be free from cruel and unusual punishment. The plaintiffs cite prison conditions such as overcrowding, lack of adequate sanitation, poor ventilation, lack of pest control, and understaffing at MDSP as examples of the conditions which give rise to their Eighth Amendment prison condition claim.

Fourth, the plaintiffs allege defendants have violated their Eighth Amendment right to be free from cruel and unusual punishment by providing inadequate health care at MDSP.

Fifth, the plaintiffs allege defendants have violated their Eighth Amendment right to be free from cruel and unusual punishment by providing an inadequate diet at the MDSP.

Sixth, plaintiffs allege defendants have violated their due process rights during disciplinary hearings because they are not allowed to call witnesses or present evidence on their own behalf.

Seventh, plaintiffs allege defendants have violated the Americans With Disabilities Act because many portions of MDSP are not handicap accessible, thereby rendering many of the prison programs and facilities unavailable to inmates who are confined to wheelchairs.

The sufficiency with which plaintiffs articulate each of these claims and whether each survives screening is discussed below.

## 1. The Access to the Courts Claim

Prisoners have a constitutional right of access to the courts.  Bounds v. Smith, 430 U.S. 817, 821 (1977), overruled in part Lewis v. Casey, 518 U.S. 343, 354 (1996).[2]  This includes the right by prisoners to pursue direct appeals of their convictions, to seek habeas relief, and to file civil rights actions.  Id. at 821-23.  This right imposes an obligation on prison authorities to provide indigent inmates with paper and pen to draft legal documents, notary services, and stamps to mail court documents.  Id. at 824-25.  Prisoners, no less than lawyers, must also "know what the law is in order to determine whether a

---

[2] The Lewis Court overruled statements in Bounds that suggested that the right of access to the courts required states to enable prisoners to *discover* grievances and to *litigate effectively* once in court.  Lewis, 518 U.S. at 354.

colorable claim exists, and if so, what facts are necessary to state a cause of action." Id. at 825.  Thus, the right of access to the courts may be protected where prison officials either provide prisoners with adequate law libraries, or provide them with assistance from persons trained in the law—although other methods might also pass constitutional muster.  Id. at 828.  See also Lewis, 518 U.S. at 351.

A prisoner asserting a claim of violation of his or her right of access to the courts must establish an "actual injury" in order to prevail on a § 1983 claim premised on that right.  Lewis, 518 U.S. at 351-52; Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001) (citing Klinger v. Dept. of Corrections, 107 F.3d 609, 617 (8th Cir. 1997)).  "Actual injury" means "that a nonfrivolous legal claim had been frustrated or was being impeded" by defendants' failure to maintain an adequate law library or to provide adequate legal assistance. Lewis, 518 U.S. at 352-53; Moore, 266 F.3d at 933 (quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998)).

The Lewis Court emphasized the types of cases outlined in Bounds to which the right of access to the courts applies:  direct appeals of criminal convictions, habeas petitions, and civil rights actions to vindicate basic constitutional rights.  Lewis, 518 U.S. at 354.  Thus, if a prison elects to provide a law library to its inmates, it need not provide every volume of the United States Code, most volumes of which concern federal laws that have no relation to prison inmates.  Id. at 355.  Likewise, access to legal resources concerning shareholder-derivative actions and slip-and-fall claims would fall

11

outside the purview of the right of access to the courts.  Id.  Legal materials addressing these types of claims are simply outside the scope of materials prisoners need to "attack their sentences, directly or collaterally," or "to challenge the conditions of their confinement," matters that are at the heart of the right of access to the courts.  Id.  Denial of legal resources regarding these extraneous topics "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Id.

    To support their claim that the defendants have denied their First Amendment right to adequate access to the courts, the plaintiffs have alleged the MSDP mailroom staff is so poorly trained that "it is not uncommon" for inmates to get each other's mail by mistake.  Complaint, ¶ 52.  This causes mail to be received by the correct inmate  "weeks or sometimes months" late. Id., ¶ 53.  Plaintiff Dale asserts he did not receive his opponents' appellate brief in a Minnesota federal civil rights case (Dale v. Brott, et. al., Eighth Circuit Court File No. 13-3412) until over three months after the appellees' lawyer mailed it to him at the MDSP.  Id., ¶ 56. Mr. Dale asserts he lost his appeal because he did not receive the appellees' brief in time to submit his reply brief. Id., ¶ 57.

    The plaintiffs also assert the MDSP law library is insufficient.  Id. ¶¶ 68-88. It consists of South Dakota Codified Laws, American Jurisprudence, Black's Law Dictionary, State and Federal Court Rules, and U.S. Code books. Id., ¶ 71.  The plaintiffs allege, however, that the law books are not maintained by a law clerk, and that many are "decades old" and are missing pages.  Id.,

¶ 70. They assert there is only one edition of each book and many of the supplements are missing.  <u>Id.</u>, ¶ 72. They also assert the books are not up-to-date, with the most current edition being 2004 or 2005.  <u>Id.</u>  There is no case law available in the law library.  <u>Id.</u>, ¶ 73.

The plaintiffs also allege the law library is very small, and has only two computers (non-internet), one typewriter, and one printer. <u>Id.</u>, ¶ 74. Inmates are allowed to use the law library for two hours and forty-five minutes, twice per week.  <u>Id.</u>, ¶¶ 75-76.  Because of limited space, however, many times there is not enough space for all the inmates who wish to use the law library to do so.  <u>Id.</u> ¶77.  The plaintiffs allege the lack of time, space and resources has caused "many" inmates to "simply give up" on pursuing their appeals, petitions for habeas corpus, or federal civil rights actions.  <u>Id.</u>, ¶ 78. None of the remaining plaintiffs other than Dale allege <u>they</u> have given up on a non-frivolous civil rights lawsuit, direct appeal, or habeas corpus action.

They further assert the prison staff member who supervises the law library shows preferential treatment to inmates who, contrary to posted MDSP rules, use the MDSP law library space and resources to pursue personal or religious tasks instead of their own legal work. <u>Id.</u>, ¶¶ 81-84. Plaintiffs assert this behavior prevents them from completing their legitimate legal work. <u>Id.</u>, ¶ 81.

Plaintiffs also assert the contract attorney provides insufficient legal assistance. <u>Id.</u>, ¶¶ 89-98.  They explain the contract attorney comes to MDSP only twice per month for two hours at a time.  <u>Id.</u>, ¶ 90. He distributes legal

13

forms and approves case law copies, but provides no actual legal advice or assistance.  Id., ¶ 91.  Plaintiffs assert "many" MDSP inmates have missed their federal § 2254 statute of limitations because the contract attorney refused to help them file their pre-requisite state criminal appeals or state habeas actions.  Id., ¶ 94. None of the remaining named plaintiffs, however, allege they have missed their federal § 2254 statute of limitations deadlines for these reasons.  Plaintiffs also assert the defendants cite as a reason for failing to provide a better law library that "inmates can get legal assistance from [the contract attorney]."  Id., ¶ 97.

Plaintiff Dale's First Amendment access to the courts claim survives screening by a slim reed.  This is because liberally construed, plaintiff Dale asserts he was actually injured by the inadequacy of the legal resources available to him at MDSP because, after failing to timely receive his opponents' brief in a pending civil rights manner, he was unable to timely respond and his case was dismissed by the Eighth Circuit.  This claim is sufficient to survive screening pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 12(b)(6).  The court takes no position, however, about whether the access to the courts claim can or will survive a properly supported motion for summary judgment pursuant to FED. R. CIV. P. 56.   No other plaintiffs have alleged actual injury, so their First Amendment access to the courts claims should be dismissed on screening before the complaint is served.  Lewis, 518 U.S. at 351-52; Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001).

14

### 2. The Due Process Administrative Remedy Claim

The Prison Litigation Reform Act ("PRLA") requires a prisoner to exhaust his administrative remedies.  Specifically, 42 U.S.C. § 1997e(a) provides:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The prisoner must exhaust his administrative remedies even if the precise relief he seeks in his § 1983 lawsuit is not available through the prison grievance system.  Booth v. Churner, 532 U.S. 731, 739 (2001).  Also, although § 1997e(a) refers to "prison conditions," the United States Supreme Court has stated "the PRLA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516 (2002).  " . . [A] remedy that prison officials prevent a prisoner from utilizing is not an available remedy under     § 1997e(a) . . . " Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(internal punctuation and citations omitted).

The plaintiffs assert MDSP has a "two-tier" grievance process which consists of informal resolution requests, followed by an administrative remedy process.   Complaint, ¶ 104. The plaintiffs acknowledge that pursuant to the Prison Litigation Reform Act ("PRLA") they must exhaust their available administrative remedies before filing a federal civil rights action pursuant to 42 U.S.C. § 1983.  Id. ¶ 105.  The plaintiffs allege the defendants discourage them from pursuing their administrative remedies and sometimes refuse to provide

15

the appropriate forms for plaintiffs to initiate the process.  Id. ¶ 106-110, 113-114.  Plaintiffs allege the defendants "do this through intimidation and lies."  Id., ¶ 113.  Plaintiff Fuerst specifically alleges he has been denied the ability to file grievances about the conditions in which he lives in the MDSP health services department.  Id., ¶ 114.  The plaintiffs further allege the administrative remedy coordinator refuses to process their administrative remedy requests for reasons that are often false.  Id., ¶ 115.  The plaintiffs assert that in "many" pleadings in the United States District Court, the defendants have claimed failure to exhaust as a defense and requested dismissal of their lawsuits based on failure to exhaust administrative remedies.  Id., ¶ 116.

This cause of action should be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(E)(2)(B)(ii) and 1915A(b)(i). This is because even assuming the truth of the plaintiffs' allegations, "[t]o state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States " West v. Atkins, 487 U.S. 42, 48 (1988).  And, "while a violation of a state-created liberty interest can amount to a violation of the Constitution, not every violation of state law or state-mandated procedures is a violation of the Constitution." Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993).  That the state prescribes certain procedures does not mean the procedures acquire constitutional dimension.  Id.

In Buckley, the inmate brought a § 1983 lawsuit because prison officials refused to process his prison grievances.  Id. at 495.  The Eighth Circuit held

that the prison officials' refusal to process Mr. Buckley's grievances, standing alone, did not state a cause of action because there is no constitutional right to a grievance procedure.  Id. The court explained, "[a] prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates.  Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment."  Id. (citations omitted).  See also, King v. Houston, 556 Fed. Appx. 561, 563 (8th Cir. 2014) (citing Buckley for the proposition that "prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983.").

The court is mindful of the plaintiffs' position that the defendants have discouraged or even attempted to prevent them from complying with the requirements of 42 U.S.C. § 1997e(a).  The plaintiffs' position, however, is not incompatible with the court's recommended dismissal of this claim.  The Eighth Circuit has instructed "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under § 1997e(a)."  Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001).  For instance, if prison officials prevent exhaustion by refusing to respond to the inmate's proper utilization of the institution's grievance procedure, the inmate cannot be held to the exhaustion requirement.  See e.g. Foulk . Charrier, 262 F.3d 687, 698 (8th Cir. 2001).  If it was not the prison official's actions, but instead the inmate's own subjective (but incorrect) beliefs about the administrative remedy procedure which motivated  him to forego pursuing administrative remedies, the failure to

exhaust is not excused.   Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000).

If and/or when the defendants assert as an affirmative defense to any of the

plaintiffs' claims that they have not exhausted their affirmative remedies, the

court will sort out whether the remedies were "available" to the plaintiffs under

§ 1997e(a).

Because there is no free-standing constitutional right to a grievance

process, this court recommends that the cause of action titled "Informal

Resolution Request & Administrative Remedy Process," complaint ¶¶ 104-117,

be stricken from the plaintiffs' complaint prior to service for failure to state a

claim upon which relief may be granted pursuant to 28 U.S.C.

§§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3.  The Eighth Amendment Prison Conditions Claim

"The Constitution does not mandate comfortable prisons; it prohibits

inhumane ones."  Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (citing

Farmer v. Brennan, 511 U.S. 825, (1994)).

> To establish that a prisoner's conditions of confinement violate the
> Eighth Amendment, the prisoner must show that (1) the alleged
> deprivation is, objectively, sufficiently serious, resulting in the
> denial of minimal civilized measure of life's necessities, and
> (2) that the prison officials were deliberately indifferent to an
> excessive risk to inmate health or safety, meaning that the officials
> actually knew of and disregarded the risk. . . . Absent a showing
> that the prison officials consciously understood that prison
> conditions created such an excessive risk, the conditions are not a
> punishment within the meaning of the Eighth Amendment.

Williams, 49 F.3d at 445 (internal punctuation and citations omitted).

"Constructive knowledge, or the 'should have known' standard, is not sufficient

to support a finding of deliberate indifference . . ."  Spruce v. Sargent, 149 F.3d

783, 786 (8th Cir. 1988). Also, "the length of time a prisoner is subjected to harsh conditions is a critical factor in [the Eighth Amendment] analysis." Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) (summary judgment in favor of defendants appropriate when inmate subjected to raw sewage in his cell for four days).

In their complaint, the plaintiffs assert the conditions at MDSP violate the Constitution in several ways. See complaint, ¶¶ 118-140, 144-180. They assert that what were formerly two-person college dorm rooms have been converted to three, six and nine-man rooms to house inmates. Id. ¶ 118. They further assert the lack of programming at MDSP causes the "majority" of the inmate population to sit idle seven days a week. Id., ¶ 119. The plaintiffs allege the overcrowding coupled with lack of programming leads to fights, assaults and extortion, which affects smaller and weaker inmates the most. Id., ¶ 120. None of the remaining named plaintiffs claim to be the smaller, weaker inmates who have in fact been extorted.

The plaintiffs also assert the lack of recreation space and equipment leads to fights and assaults. Id. at ¶ 121. They assert "many" inmates quit going to recreation because they do not wish to fight over equipment. None of the remaining named plaintiffs claim to have stopped going to recreation for fear of fighting over the equipment.

The plaintiffs further allege that because there is only one shower per twenty-five inmates in two of the living units, there are long lines for showers. Id. at ¶ 122. This leads to fights and assaults. Id. Similarly, there is only one

toilet per twenty-five inmates in some housing units. Id. at ¶ 123. During flu outbreaks, inmates vomit in sinks and garbage cans, which is left for hours at a time before it is cleaned up. Id. Additionally, the toilet shortage forces inmates to break prison rules and receive disciplinary write-ups by using the toilets on alternative floors of their housing area. Id. at ¶ 124. Plaintiffs also assert the lack of space in the day halls contributes to loitering, assaults and disciplinary write-ups. Id. at ¶¶ 125-29.

Plaintiffs assert the rooms which house nine men are controlled by gangs, who steal from and extort their roommates. Id., ¶¶ 131-32. These same gang members stay up all night long "yelling, screaming and fighting" causing other inmates to "go days on end with little or no sleep." Id. at ¶ 133.

Plaintiffs also allege the MDSP is "grossly understaffed," up to twenty correctional officers short on any given day. Id. at ¶ 135. The current staff is poorly trained and unable to deal with the current number of inmates. Id. at ¶ 136. During second and third shifts the inmate-to-staff ratio is 225/2. Id. at ¶ 138. This leads to many fights, assaults and extortions which are un-noticed by the staff. Id. at ¶ 139. Staff shortages cause inmate recreation period to be cancelled two or three days per week. Id. at ¶ 145.

The housing units at one time had air conditioning, but the air conditioners were removed approximately ten years ago. Id., ¶ 150. There is no ventilation in the housing units, and the heat index in July and August sometimes reaches 105 degrees. Id., ¶ 151. The lack of ventilation also causes the rooms closest to the restrooms to smell like urine and feces. Id.

The toilet and shower shortage also causes the toilets and showers to frequently overflow and clog.  The inmates walk through the overflow and track it back to their rooms.  Id., ¶¶ 152-53.  The plaintiffs also assert MDSP is infested with insects and rodents.  Id. at ¶¶ 155-57.  They claim the wiring and plumbing is outdated and not up to code and that the living quarters are "fire traps."  Id. at ¶¶ 158-59.

During the summer of 2013, a sewer pipe broke and spilled raw sewage onto the recreation yard for several days.  Id., ¶¶ 163-167.  It was never cleaned up, it still smells, and now a thick moss grows over the surrounding fence.  Id. at ¶ 167.

The running track is full of holes[3] and is adjacent to the auto body shop where inmate workers sandblast toxic, cancer-causing paint off automobiles while other inmates are using the track.  Id. at ¶¶ 169-70.

A new dining hall was built across the compound from the kitchen where the food is cooked.  Id. at ¶ 174.  The food is transported across the campus to the dining hall to be served to the inmates, often by inmate workers using hand carts which spill food onto the ground.  Id. at ¶ 174. The dining hall is unsanitary, with food often covered in flies.  Id. at ¶ 175.  The laundry department often delivers laundry that is wet, smells like mold, and "can cause lice" to spread.  Id. at ¶¶ 177-78.

---

[3] The plaintiffs allege an inmate fell into one of these holes and broke his ankle in 2014, but they do not allege the inmate who broke his ankle is one of the named plaintiffs in this lawsuit.  Complaint, ¶ 169.

Though the plaintiffs allege these deficiencies at MDSP cause unsafe conditions, they do not specifically allege personal past or current injury.  In Helling v. McKinney, 509 U.S. 25, 33 (1993), however, the United States Supreme Court explained that lack of a current injury is not fatal to an inmate's Eighth Amendment prison condition claim.  In that case, the inmate claimed a violation of the Eighth Amendment because he was exposed to second-hand smoke by his cell make who smoked five packs of cigarettes a day.  Id. at 28.  The Court granted certiorari to address whether an inmate could state a claim upon which relief could be granted by alleging his compelled exposure to second hand smoke "poses an unreasonable risk to his health."  Id. at 31.  The state argued there was no cause of action unless the inmate currently suffered from medical problems caused by the second-hand smoke.  Id. at 32-33.   The Court explained, however, that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  Id. at 33.

The Helling Court cautioned that on remand, the inmate's task would not be easy.  Id. at 35.  While agreeing the inmate should be allowed to try to prove his claim, the Court explained, "in the course of such proof, he must also establish that it is contrary to the current standards of decency for anyone to be so exposed against his will and that prison officials are deliberately indifferent to his plight."  Id.  The Court also reminded the inmate he must

prove both the objective and subjective elements necessary to prove any Eighth Amendment claim.  Id.

> With respect to the objective factor, [the inmate] must show that he himself is being exposed to unreasonably high levels of [second-hand smoke]. . . . . Also with respect to the objective factor, determining whether [the inmate's] conditions of confinement violate the Eighth Amendment requires more than scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by [second hand smoke].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

Id. at 35-36.

The plaintiffs have alleged (but not yet proven) several deficiencies at MDSP present an unreasonable risk of harm.  The court may not dismiss their claims on screening solely because nothing has yet happened to them.  For this reason, their Eighth Amendment prison conditions claim survives screening.  The court cautions however, at least for some of the deficiencies about which plaintiffs complain, as in Helling, that it foresees a difficult task ahead for plaintiffs in opposing a summary judgment motion.  They must both produce some scientific and statistical evidence to support their claims, and persuade the court that the risk posed is not one that today's society chooses to tolerate.  That task, however, is for another day.

### 4.  The Eighth Amendment Health Care Claim

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir.

2015).  That prohibition includes prison officials' deliberate indifference to the medical needs of inmates.  Id.  That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Id. at 104-05.  "[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.  Allegations of negligence are not enough to state a claim.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)).  Plaintiffs are required to show (1) they suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs.  Id. (citing Coleman, 114 F.3d at 784).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious

24

that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784.  To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).   A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness:  disregarding a known risk to the inmate's health.'" Allard, 779 F.3d at 771-72.

A plaintiff can show deliberate indifference by demonstrating grossly incompetent or inadequate care; showing a defendant's decision to make a less efficacious and easier course of treatment; or demonstrating that a defendant denied access to or intentionally delayed medical care.  Id. at 772.

Here, the plaintiffs assert there is not enough health services staff to provide health care to the "grossly overcrowded" inmate population at MDSP. Complaint, ¶ 182.  Not enough funding is allocated to provide adequate health care to MDSP inmates.  Id. at ¶ 183.  "Many" inmates have been denied prescribed health care such as orthotics, hearing aids, prescription eyewear, medication, and off-site medical care because of inadequate funding.  Id. at ¶ 184.  Unit staff tells inmates that to receive these prescribed items, their family must purchase them, the item will not be provided because the item was not ordered, or the item is for comfort only.  Id. at ¶ 185.  Plaintiff Koch asserts a two-year delay in receiving his prescribed hearing aid.  Id., ¶ 186.  Plaintiff Koch also asserts he received no treatment whatsoever for his hepatitis C for

25

two years, and that he still has not received a liver biopsy despite the physician assistant's medical order.  Id., ¶¶ 187-90.

Plaintiff Klinghagen asserts he has had Type 1 diabetes since childhood and that his doctors installed an insulin pump to regulate his blood sugar in 2001.  Id., ¶ 199.  MDSP medical staff, however, removed the insulin pump shortly after Mr. Klinghagen arrived at MDSP.  Id. at ¶ 200.  Since his insulin pump was removed, Mr. Klinghagen's blood sugars have been extremely varied on a daily basis, ranging from 50 to 500.   Id. at ¶ 201.  Mr. Klinghagen has suffered from several seizures as a result of low blood sugar.  Id., ¶ 202.  Many other diabetic inmates also suffer from constant, daily blood sugar fluctuations.  Id., ¶ 203.  Diabetic inmates must wait too long after receiving their insulin to eat, which causes low blood sugar and related problems.  Id., ¶ 204.  Finally, the living quarters at MDSP are cold, but the health services staff refuses to prescribe thermal or other warm-weather clothing.  Id. , ¶¶ 205-07.

Mr. Fuerst asserts he has been diagnosed with a rare medical disorder (Lesch-Nyhan Syndrome) which requires "around-the-clock" medical care. Docket 15, ¶ 3.  He further asserts he is forced to lie in his own urine-soaked bedding, and sometimes has not gotten a shower for several days at a time. Complaint, ¶ 278.  Mr. Fuerst assets MDSP does not have adequate health services staff to provide care for him.  Id. at ¶ 281.  He often does not receive the nutritional supplement which has been prescribed for him.  Id. at ¶ 283.

26

Plaintiffs Koch, Klinghagen and Fuerst have alleged they suffer objectively serious medical needs and that defendants actually knew of but deliberately disregarded those needs by ignoring or denying medical orders. These three claims are sufficient to survive screening pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 12(b)(6).  The court takes no position, however, about whether these Eighth Amendment medical care claims can or will survive a properly supported motion for summary judgment pursuant to FED. R. CIV. P. 56. The Eighth Amendment health care claim should be dismissed on screening as to the remaining plaintiffs because they have not alleged they suffer objectively serious medical needs to which the defendants were deliberately indifferent.

### 5. The Eighth Amendment Inadequate Diet Claim

Prisoners have a right to nutritionally adequate food.  Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992).  A prisoner's mere dissatisfaction with his menu is insufficient to state a constitutional violation.   "[W]hile the systematic malnourishment of a prisoner could constitute cruel and unusual punishment, the occasional missed meal does not." Cunningham v. Eyman, 2000 WL 748098 at *6 (N.D. Ill. June 9, 2000).  To prevail on a cruel and unusual punishment claim based on inadequate meals, the prisoner must allege specific physical harm or health risk (other than hunger pains), or that he was denied a nutritionally and calorically adequate diet.  Berry v. Brady, 192 F.3d 504, 508 (5th Cir. 1999).

Here, the plaintiffs explain their food is cooked in a location which his remote from the dining hall and "trucked across the compound by truck, or inmates with handcarts." See Complaint, ¶ 210.  Sometimes the food spills out and is never cleaned up. Id. at ¶ 211.  The plaintiffs also allege some of them are prescribed special diets (heart healthy, bland, lactose free, allergen free, etc.). Id. at ¶ 212.  Plaintiff Hayes was prescribed a bland diet, to exclude several particular food items including tomatoes, onions, peppers, citrus, chocolate, gravy, sauerkraut, nuts, mayonnaise, beans and rice. Id., ¶ 213. The defendant food service workers have, on a daily basis, attempted to feed plaintiff Hayes items he has been instructed to avoid.  Id. at ¶ 215.  Defendants refuse to replace the prohibited items with anything else.  Id. at ¶ 216. Mr. Hayes is in "constant" gastro-intestinal distress.  Id. at ¶ 223.  The MDSP staff refuse to intervene but instead punish him by forcing him to eat his meal trays in his room if he complains.  Id. at ¶ 217-18.  In fact, after he filed over sixty (60) grievances about his medically prescribed diet, MDSP staff forced Mr. Hayes to relinquish his copy of the list of foods he was advised to avoid.  Id. at ¶ 220-22.

The plaintiffs assert that inmate employees prepare medically prescribed diets with "little or no" supervision by CBM food services, the outside contractor hired to provide the food services to MDSP.  Id. at ¶ 229. Consequently, the medical diet trays are inconsistent and incorrect.  Id.  All medical diet trays, whether bland, heart healthy, or allergen free, are in reality the same trays.  Id. at ¶ 230.  As a result, inmates who receive incorrect trays

have no choice but to go hungry.  Id., ¶ 231.  Inmates who do not receive enough calories from their food service trays must make up the difference by buying commissary items.  Id. at ¶ 232.  Many inmates request to be removed from their medical diets but the mainline diet trays are "so unhealthy and nutritionally inadequate that inmates who eat [them] will eventually develop type 2 diabetes, heart disease, high blood pressure, ulcers, gout, or a list of other health problems associated with an unhealthy or nutritionally inadequate diet."  Id., ¶ 234.

Plaintiffs claim the incidence of the aforementioned health problems are much higher than the national average.  Id., ¶ 235.  They further claim that MDSP health services staff, MDSP correctional officers, and MDSP administration have all admitted that the diet at MDSP is "unhealthy and will eventually lead to the aforementioned problems" but refuse to do anything about it.  Id., ¶ 236.  The plaintiffs also assert that although CBM's menu is approved by a dietician, CBM does not actually follow the approved menu.  Id. ¶ 237.  Instead, plaintiffs allege CBM substitutes cheaper, smaller, less healthy items to save money.  Id.

Finally, plaintiffs assert that the inmates who receive medical or religious diet trays are "segregated" and forced to eat last in the dining hall.  Id. at ¶ 242.  This causes the religious and medical diet tray inmates to miss their 6:00 p.m. recreation period.  Id. at ¶ 244.  Consequently, many inmates have asked to be removed from the medical and religious diet tray list.  Id. at ¶ 245.

Inmate Hayes asserts he has been prescribed a specific medical diet but that he does not receive that diet.  He also asserts that as a result, he is forced to go hungry and/or is in "constant" gastro-intestinal distress.  Additionally, the plaintiffs allege that prison officials have <u>acknowledged</u> the diet fed to inmates at MDSP is so unhealthy that it will inevitably lead to type 2 diabetes, heart disease, high blood pressure, ulcers, gout, or a list of other health problems associated with an unhealthy or nutritionally inadequate diet.

These assertions are sufficient to allege a claim that plaintiffs are systematically malnourished.  <u>Cunningham,</u> 2000 WL 748098 at * 6.  At such, the Eighth Amendment inadequate diet claim survives screening as to all plaintiffs. The court takes no position, however, about whether the Eighth Amendment inadequate diet claim can or will survive a properly supported motion for summary judgment pursuant to FED. R. CIV. P. 56.

### 6. The Due Process Inadequate Disciplinary Hearings Claim

In this section of their complaint (¶¶ 248-254, 264-268)[4], the plaintiffs assert generally that disciplinary hearings at the MDSP do not comply with due process because many of the staff members who conduct the hearings are biased and unfair, are related to each other, or are simply hostile toward the inmates.  Complaint, ¶¶ 248-254, 264-265.  They further assert "many"

---

[4] The complaint originally contained more paragraphs that specifically referenced disciplinary matters relating to Mr. Blackwell and Mr. Stanish. Those two gentlemen have chosen to disassociate themselves from the lawsuit. Because the remaining plaintiffs cannot pursue Mr. Blackwell and Mr. Stanish's claims on their behalf (<u>Martin</u>, 780 F.2d at 1337) the paragraphs which are specific to them are not considered on screening.

inmates have been denied parole and have been assessed fines "based on the current inmate disciplinary system at MDSP." Id., ¶ 266.

A prison inmate's right to due process  regarding his classification (and accompanying privileges or lack thereof) within prison walls was clarified and greatly circumscribed by the United States Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995).  In that case, the Court stated:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Sandin, 515 U.S. at 483-84 (citations omitted).  The Court held the prisoner's discipline in segregated confinement "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  Id. at 486.

In Freitas v. Ault, 109 F.3d 1335 (8th Cir. 1997), the prisoner plaintiff complained his due process rights were violated when he was disciplined and transferred to a different facility and placed in "on-call" status.  These disciplinary measures meant the prisoner was:  placed in "lock-up" (i.e. was allowed out of his cell for only one or two hours per day), allowed fewer visitors and no phone calls, not allowed to work at a prison job, restricted in his ability to keep personal items in his cell, and restricted in his ability to earn good time credits.  Frietas,  109 F.3d at 1337.  The Eighth Circuit held as a matter of law that "these conditions

do not constitute any atypical and significant hardship when compared

to the burdens of ordinary prison life." Id.

Sandin likewise rejected the premise that a disciplinary action might affect

an inmate's parole as creating a due process right. [5]  Sandin, 515 U.S. at 487.

The Court noted:

> [n]othing in Hawaii's code requires the parole board to deny parole
> in the face of a misconduct record or to grant parole in its absence,
> even though misconduct is by regulation a relevant consideration.
> The decision to release a prisoner rests on a myriad of
> considerations.  And, the prisoner is afforded procedural protection
> at his parole hearing in order to explain the circumstances behind
> his misconduct record.  The chance that a finding of misconduct
> will alter the balance is simply too attenuated to invoke the
> procedural requirements of the Due Process Clause.

Id. (emphasis added).  South Dakota inmates are likewise afforded a hearing if

they disagree with the warden's determination they have not met the

requirements for automatic release on their initial parole date.  See SDCL 24-

15A-39.  Similarly, nothing in South Dakota's code requires the South Dakota

Board of Pardons and Paroles to deny parole in the face of a misconduct record

or grant parole in its absence.  See SDCL 24-15A-42.  That statute states:

> **24-15A-42.  Procedural Rules-Parole release standards**
> Pursuant to chapter 1-26, the board may promulgate procedural
> rules for the effective enforcement of this chapter and for the
> exercise of powers and duties conferred upon it.  Additionally, the
> board shall utilize the following standards in determining if the
> inmate has substantively met the requirements for parole release
> at the initial parole date:
> (1) The inmate's compliance with work, school, and program
>     directives;

---

[5] Mr. Stanish asserted that a wrongly decided major write up was a
"determining factor" in the parole board's decision to deny his parole.
Complaint, ¶ 263.  Mr. Stanish, however, is no longer a party to this lawsuit.

    (2) The inmate's compliance with the rules and policies of the
        department;
    (3) Conduct by the inmate evincing an intent to reoffend; and
    (4)  Mitigating factors impacting the warden's determination of
        substantive noncompliance.
The Board may also use standards in subdivisions (1) to (3),
inclusive, of this section in discretionary parole decisions.  In
addition to considering a discretionary parole for an inmate who
previously violated parole, the board may consider the nature and
seriousness of the conduct leading to the parole revocation.

In this case, therefore, as in <u>Sandin</u>, the decision to release an inmate on

parole rests on a "myriad of considerations." <u>Sandin,</u> 515 U.S. at 487.  "The

chance that a finding of misconduct will alter the balance is simply too

attenuated to invoke the requirements of the Due Process Clause." <u>Id.</u>  For this

reason as well, this section of the plaintiffs' complaint fails to state a cause of

action upon which relief may be granted and should be dismissed pursuant to

28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) prior to service upon the

defendants.

### 7.  The Americans With Disabilities Act Claim

      The provisions of the ADA are applicable to the prison setting.  <u>See</u>

<u>generally</u>, <u>Yeskey v. Commonwealth of Pennsylvania Dept. of Corrections</u>, 118

F.3d 168 (3d Cir. 1997).   In <u>Randolph v. Rogers</u>, 170 F.3d 850 (8th Cir. 1999),

the Eighth Circuit applied the ADA and the Rehab Act to a prisoner's claim.

The court noted "the ADA and the RA are similar in substance and, with the

exception of the RA's federal funding requirement, cases interpreting either are

applicable and interchangeable." <u>Id.</u> at 858.  To state a prima facie claim, the

plaintiff must show: (1) he is a person with a disability as defined by the

statute; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit due to discrimination based upon disability.  Id.

In their complaint, the plaintiffs allege the recreation areas, law library, and many of the rehabilitation programs are not accessible to inmates confined to wheelchairs.  Complaint, ¶¶ 269-271.  Plaintiff Fuerst alleges he is confined to a wheelchair and because of his medical condition, must reside in the health services area of MDSP.  Id. at ¶ 275.  Mr. Fuerst asserts he, as an inmate with a disability, does not receive adequate health care.  Id. at ¶¶ 277-79, 281-84.

Mr. Fuerst also filed a supporting affidavit.  Docket 15.  In his affidavit, Mr. Fuerst explains he has little or no access to the law library (id. at ¶ 21), to recreation (id., ¶¶ 14-15), or to employment opportunities (id. ¶ 16).  He also generally alleges that the health care he receives as an inmate with a disability is inadequate.  Id. at ¶¶ 10-13, 18, 24-34.

Mr. Fuerst's ADA claim is sufficient to survive screening.  Mr. Fuerst has sufficiently alleged he is a qualified person with a disability who has been excluded from certain MDSP benefits (recreation, the law library, and health care) due to discrimination based upon his disability.  The court takes no position, however, about whether the Americans With Disabilities Act claim can or will survive a properly supported motion for summary judgment pursuant to FED. R. CIV. P. 56. The Americans With Disabilities Act claim should be dismissed on screening before service upon the defendants as to the remaining plaintiffs, however, because the remaining plaintiffs have not alleged they are qualified persons with a disability to whom the ADA applies.

34

## CONCLUSION and RECOMMENDATION

The remaining plaintiffs' complaint has been screened as required by the Prison Litigation Reform Act ("PRLA"), 28 U.S.C. § 1915.  The Court has determined the remaining plaintiffs' complaint is partially sufficient to survive screening.  Therefore, it is RECOMMENDED to the district court:

(1) That the following portions of the complaint and/or supporting documents be stricken because the corresponding formerly named plaintiffs have chosen to disassociate  themselves from the lawsuit:

**Brian Holzer:**          Docket 1, ¶2; Docket 7 (Affidavit of Brian Holzer)

**Demetrius Colaites:**    Docket 1, ¶¶ 4, 141, 142 and 143; Docket 8 (Affidavit of Demetrius Petro Colaites)

**Trevor Erickson:**       Docket 1, ¶¶ 5, 95, and 239; Docket 10 (Affidavit of Trevor John Erickson)

**Kevin Crank:**           Docket 1, ¶¶ 7, 224, 225, 226, 227 and 228;Docket 12 (Declaration of Kevin Christopher Crank)

**Guy Blesi:**             Docket 1, ¶¶ 6, 96, 99, 100, 101, 102, 111, and 112; Docket 11 (Affidavit of Guy Allen Blesi)

**Edward Darity:**         Docket 1, ¶¶ 9, 192, 193, 193, 195, 196, 197 and 198; Docket 14 (Affidavit of Edward Eugene Darity)

**Robert Blackwell:**      Docket 1, ¶¶ 11, 255, 257, 258, and 259; Docket 16 (Affidavit of Robert Eugene Blackwell)

**Dennis Stanish:**        Docket 1, ¶¶ 13, 191, 260, 261, 262, 262 and 263; Docket 18 (Affidavit of Dennis Louis Stanish, II)

35

(2) That that the cause of action titled "Informal Resolution Request & Administrative Remedy Process," complaint, ¶¶ 104-117, be dismissed prior to service for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

(3) That the cause of action titled "Inmate Due Process and Disciplinary Hearing" complaint, ¶¶ 248-268, be dismissed prior to service for failure to state a claim upon which relief may be granted  pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

(4) That the cause(s) of action entitled "Mail and Legal Mail, Mike Durfee State Prison Staff, Law Library, Inmate Legal Assistance, Other Legal Issues" (First Amendment Access to the Courts) (complaint, ¶¶52-103) survives screening as to plaintiff Dale but should be dismissed prior to service as to the other remaining plaintiffs because they fail to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

(5) That the cause of action entitled "Inmate Health Care and MDSP Health Services," (complaint, ¶¶ 181-208) (Eighth Amendment Health Care Claim), survives screening as to plaintiffs Koch, Klinghagen and Fuerst, but should be dismissed as to the other remaining plaintiffs because they fail to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

(6) That the "Inmates with Disabilities and Americans with Disabilities Act Issues" (complaint, ¶¶ 269-289) survives screening as to plaintiff Fuerst but should be dismissed as to the other remaining plaintiffs because they fail to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

(7) If the district court adopts this Report and Recommendation, The United States Marshal shall serve a copy of the balance of the complaint (Docket1), Summons, and a copy of this Report and Recommendation and a copy of the Order adopting the Report and Recommendation upon defendants as directed by plaintiffs.  All costs of service shall be advanced by the United States.

(8) Plaintiffs shall serve upon defendants, or if appearance has been entered by counsel, upon their attorney, a copy of every further pleading or other document submitted for consideration by the Court.  Plaintiffs shall include with the original paper to be filed with the Court a certificate stating the date a true and correct copy of any document was mailed to defendants or their counsel.  Any paper received by a district judge or magistrate judge which has not been filed with the Clerk or which fails to include a certificate of service will be disregarded by the Court.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 25th day of May, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge